**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NICOLE BOLDER, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 5:23-cv-05138-JMG |
| | : | |
| OFFICER THOMAS BRECKER, | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                              **November 5, 2025**

## I.    OVERVIEW

Plaintiff Nicole Bolder raises Section 1983 claims for racial discrimination under 42 U.S.C. § 1981 and unlawful seizure, as well as supplemental claims for unlawful detention/false imprisonment, intentional infliction of emotional distress, and assault against Defendant Officer Thomas Brecker. Much of the encounter between Plaintiff and Defendant was captured on Defendant's body-worn camera, but some genuine fact issues remain. Accordingly, Plaintiff's claims for unlawful seizure and false imprisonment, as well as her request for punitive damages, survive summary judgment, and Defendant is not entitled to the protections of qualified immunity or the Pennsylvania Political Subdivision Tort Claims Act. However, the Court will grant summary judgment on Plaintiff's racial discrimination, intentional infliction of emotional distress, and assault claims.

## II.    BACKGROUND

On January 20, 2022, Plaintiff Nicole Bolder was shopping at Walmart in Caernarvon Township, Pennsylvania. Pl.'s Statement of Disputed Facts at 10 ¶ 1 (ECF No. 48-1). While

loading her car with groceries, she became locked out of her car, locking in her dog, purse, and cell phone. *Id.* at 10 ¶ 3 [sic]. After attempting to call for help, she asked for someone to call the police for assistance. *Id.* at 11 ¶ 3.

When Defendant Officer Thomas Brecker arrived at approximately 7:32 PM, originally responding to a 911 hang-up call, he offered to call a towing company to unlock Plaintiff's car. *Id.* at 11 ¶¶ 3-4 (ECF No. 48-1); App'x to Def.'s Mot. for Summ. J., Ex. A, at 0:44-1:10 (ECF No. 47-1); Def.'s Statement of Undisputed Facts at ¶ 6 (ECF No. 47). Plaintiff told Defendant that she did not "have anything to give, do they bill people?" App'x to Def.'s Mot. for Summ. J., Ex. A, at 1:08-1:11 (ECF No. 47-1). Defendant replied, "yeah." *Id.* at 1:12. Plaintiff asked if Defendant could make the call. *Id.* at 1:12-14. Defendant called two different towing companies on Plaintiff's behalf, requesting "lock-out service." *Id.* at 1:45-5:15.

Plaintiff told Defendant that her mother was on her way to pick up Plaintiff and take her to pick up the spare car key. Def.'s Statement of Undisputed Facts at ¶ 18 (ECF No. 47); Pl.'s Statement of Disputed Facts at 1 (ECF No. 48-1). While they waited, Defendant received a call from a towing company, Creative Customs, informing him that a truck with lock-out tools was available to assist Plaintiff. Def.'s Statement of Undisputed Facts at ¶ 20 (ECF No. 47). Plaintiff confirmed that she wanted Creative Customs's assistance. Def.'s Statement of Undisputed Facts at ¶ 20 (ECF No. 47); Pl.'s Statement of Disputed Facts at 1 (ECF No. 48-1). When Creative Customs's tow truck driver, Scott Gullo, arrived, Defendant left the scene. Def.'s Statement of Undisputed Facts at ¶ 21 (ECF No. 47); Pl.'s Statement of Disputed Facts at 1 (ECF No. 48-1).

Gullo unlocked Plaintiff's car within about ten minutes and asked Plaintiff how she was going to pay.[1] App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 21 (ECF No. 48-2). Plaintiff explained that she did not have money on her, but Defendant told her that Creative Customs would bill her at a later date. *Id.* Gullo advised that was incorrect; Creative Customs required payment immediately. *Id.* Plaintiff did not have cash, her debit card did not have $100, she did not have a credit card, and she did not have friends or family to assist. *Id.* Plaintiff called her insurance company to see if it would pay for the lock-out service, but it required her to submit a receipt for reimbursement. *Id.* Gullo called the owner of Creative Customs, Roy Hamilton, and explained the situation. *Id.* Hamilton was willing to let Plaintiff leave and obtain payment the following day, as long as there was a police report with her information. *Id.*

Shortly after Defendant returned to the police station, he received a phone call from Hamilton. Def.'s Response to Pl.'s Statement of Additional Facts at ¶¶ 6-7 (ECF No. 50). Hamilton advised that the driver completed the lock-out service, but Plaintiff did not have money to pay for the service. App'x to Def.'s Mot. for Summ. J., Ex. E, at 30 (ECF No. 47-1). Defendant returned to Walmart around 8:19 PM. *Id.*, Ex. B, at 0:01.

Video from Defendant's body-worn camera shows Defendant parking his patrol car on the opposite side of the Walmart parking lot, getting out of his patrol car, and standing with Gullo for about five seconds.[2] *Id.* at 0:01-12 (ECF No. 47-1); *see also* App'x to Pl.'s Opp'n to Def.'s Mot.

---

[1] Plaintiff reports that Gullo did not unlock her car before Defendant returned. *See* App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 16 (ECF No. 48-2). However, the footage from Defendant's body-worn camera shows Plaintiff sitting in her car upon Defendant's return to Walmart. Def.'s Mot. for Summ. J., Ex. B, at 0:12-15 (ECF No. 47-1).

[2] Gullo states that Defendant pulled into the parking lot at a high rate of speed, locked up his brakes, and slid to a stop on the opposite side of the parking lot. App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 21 (ECF No. 48-2). The video from Defendant's body-worn camera does not

for Summ. J. at 21 (ECF No. 48-2). Defendant's microphone was turned off, but Gullo reports that he tried to speak with Defendant about gathering Plaintiff's information, but Defendant ignored Gullo. App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 21-22 (ECF No. 48-2). Defendant then approached Plaintiff, who was sitting in her car. App'x to Def.'s Mot. for Summ. J., Ex. B, at 0:12-15 (ECF No. 47-1). Approximately 15 seconds into his conversation with Plaintiff, Defendant turned on the microphone. *Id.* at 0:15-0:30. During those 15 seconds of video without sound, Plaintiff does not visibly appear to be upset. *See id.*

Defendant explained to Gullo that the misunderstanding as to what Plaintiff meant by "bill" was his fault because he did not hear Plaintiff correctly. *Id.* at 0:30-52. Defendant then asked, "what can we do to resolve this?" *Id.* at 0:52-56. Plaintiff said she did not know what to do. *Id.* at 0:56-1:00. When Defendant asked if she knows anyone with $100 dollars, she became flustered and explained that she is by herself. *Id.* at 1:00-32. Plaintiff told Defendant "I can't give you something I don't have, I don't know what to do." *Id.* at 1:12-18. Defendant asked Plaintiff if she had a job, to which Plaintiff said yes. *Id.* at 1:33-36. Defendant asked when she was paid, and Plaintiff told him every other Friday. *Id.* at 1:36-45. Defendant told Plaintiff, "I suggest you call somebody." *Id.* at 1:49-51. When Plaintiff said she did not understand and that she was told the tow truck company would bill her, Defendant said, "You owe me money, I'm going to pay for it ok, but you owe me money. If you do not pay me, I will arrest you for theft." *Id.* at 1:53-2:18. At this point, Plaintiff began to cry. *Id.* at 2:22. Plaintiff told Defendant, "You don't have to talk to me like that; I'm not a bad person so why are you treating me like I'm a criminal and talking to me like that; I'm an honest person; you don't have to talk to me like that, ok, that's not necessary."

---

show Defendant sliding to a stop, and Defendant does not appear to be speeding before stopping his patrol car. App'x to Def.'s Mot. for Summ. J., Ex. B, at 0:00-03 (ECF No. 47-1).

*Id.* at 2:18-43. Defendant asks again, "When are you going to give me my money?" *Id.* at 2:43-46. Crying, Plaintiff tells Defendant that he does not have to talk to her like that. *Id.* at 2:46-49.

Defendant's second encounter with Plaintiff lasted approximately 2 minutes and 45 seconds. *See id.* at 0:15-2:56. In addition to what Defendant's body-worn camera captured, Plaintiff states that Defendant ordered her not to leave the scene.[3] App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 16 (ECF No. 48-2).

Using a similar tone of voice that he used with Plaintiff, Defendant ordered the tow truck driver, Scott Gullo, to follow him, so Defendant could give him $100 for the lock-out service. App'x to Def.'s Mot. for Summ. J., Ex. B, at 2:43-3:06 (ECF No. 47-1). Gullo tried to explain that he only needed a police report, but Defendant cut him off. App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 21 (ECF No. 48-2). Defendant told Gullo, "Just follow me. I don't want—I don't want to talk anymore. Just follow me. I'm going to pay her, I'm going to give you $100, okay." App'x to Def.'s Mot. for Summ. J., Ex. B, at 3:00-08 (ECF No. 47-1). Defendant got into his vehicle, turned around, and sped out of the parking lot. *Id.* at 3:06-19.

Gullo proceeded to the BB&T Bank at the end of the parking lot. App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 21 (ECF No. 48-2). He observed Defendant pull into the "ATM line facing the wrong direction, head on against 3 vehicles waiting to use the ATM, essentially pinning them in line." *Id.* Defendant exited his patrol car and attempted to withdraw money, but his card declined. *Id.* Defendant told Gullo to follow him to Wawa. *Id.* Defendant left the bank, again at a high rate of speed. *Id.* As Defendant approached the traffic light, he activated his emergency lights

---

[3] Plaintiff also recalls Defendant telling her to give him his "fucking money back" and that "this was bullshit." App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 17 (ECF No. 48-2). The record does not support this contention. *See generally* App'x to Def.'s Mot. for Summ. J., Ex. B (ECF No. 47-1).

and ran traffic lights along Route 23. *Id.* Gullo eventually lost sight of Defendant due to Defendant's speed. *Id.* When Gullo arrived at Wawa, Defendant gave him $100 cash. *Id.*

Gullo asked Defendant if he had Plaintiff's information. *Id.* Defendant ignored Gullo the first time he asked, so Gullo asked a second time. *Id.* Defendant yelled, "What, you didn't get it?" *Id.* Defendant returned to his patrol car and sped out of the Wawa parking lot. *Id.*

Defendant returned to Walmart, where Plaintiff was still parked. App'x to Def.'s Mot. for Summ. J., Ex. C, at 0:00-0:45 (ECF No. 47-1). Once again, Defendant parked on the opposite side of the parking lot.[4] *Id.* at 0:45. Plaintiff was visibly shaken and crying, and Defendant repeatedly apologized to her. *Id.* at 0:45-2:53. Defendant explained that he misunderstood what Plaintiff meant by "bill," and that the misunderstanding was his fault. *Id.* at 0:58-1:10. He also apologized for "all the other stuff, like arresting you," and that would not happen. *Id.* at 1:10-15. Defendant explained that he paid Creative Customs, so Plaintiff does not have to worry about paying him. *Id.* at 1:15-21. Plaintiff had cash in her hand and repeatedly attempted to pay Defendant.[5] *Id.* at 1:15-31. Defendant refused her money and explained that he would be reimbursed from the township. *Id.* at 1:30-2:35. Defendant apologized again, told her to have a good night, returned to his patrol car, and left the Walmart parking lot. *Id.* at 2:45-52.

---

[4] Gullo reported that Defendant "pinned" Plaintiff in her parking spot. App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 21-22 (ECF No. 48-2). Defendant's body-worn camera video shows that is clearly incorrect. Def.'s Mot. for Summ. J., Ex. C, at 0:45 (ECF No. 47-1).

[5] Plaintiff reports that Gullo unlocked the car after Defendant agreed to pay, and once she had access to her car, she withdrew money from the ATM. *See* App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 17 (ECF No. 48-2). That seemingly contradicts Defendant's body-worn camera video, showing Plaintiff sitting ***in her car and with her purse***, stating that she did not have $100 and could not borrow $100 from anyone. *See* App'x to Def.'s Mot. for Summ. J., Ex. B, at 0:15-2:56 (ECF No. 47-1). If Plaintiff had the means to withdraw $100 from the ATM machine this whole time, it is unclear why Plaintiff did not sooner withdraw the $100 from the ATM machine to pay Gullo before Defendant was called to return to the scene.

When Gullo returned to the Walmart parking lot, he saw Defendant having an "animated conversation" with Plaintiff. App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 22 (ECF No. 48-2). After Defendant left, Gullo drove over to Plaintiff, parked next to her, and tapped on her window. *Id.* Gullo observed Plaintiff having what he "would consider a panic attack/hyperventilating, uncontrolled crying and shaking." *Id.* Gullo attempted to calm her down and asked if she needed EMS, which she denied. *Id.* After she calmed down, Gullo asked what Defendant told her. *Id.* Plaintiff began crying and hyperventilating again. *Id.*

After she calmed down a second time, Gullo gave her the Caernarvon Township Police Department phone number, Chief Paul Stolz's name, Gullo's name, and Gullo's personal phone number. *Id.* Gullo suggested that she call the police department the next day and explain what happened because Gullo thought Defendant was "out of control and unwarranted." *Id.* Plaintiff was scared of Defendant retaliating against her because she drives those roads every day. *Id.* She also explained that Defendant apologized, and she did not need to repay him. *Id.* Gullo reiterated several times that she needed to report the incident, and that he would be doing the same. *Id.* Gullo followed through on that and wrote a letter to Chief Stoltz. *See id.* at 21-22.

Chief Paul Stolz, the Chief of Caernarvon Township Police Department, concluded that Defendant's "threats of arrest and imprisonment were unjustified and exceeded [his] scope of authority." *See* App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 28 (ECF No. 48-2). Defendant was found to have "acted irrationally," "displayed a great amount of anger and poor conduct towards [Plaintiff] and the responding tow truck operator," "operated a patrol car vehicle in an unsafe manner, failed to obey the Township's policy on Towing and failed to properly document the incident . . . pursuant to Departmental policies." *Id.* Chief Stolz issued the following statement of charges: (1) "conduct unbecoming a police officer and neglect of duty"; (2) failing to "be

responsible for the efficient performance of his duties in conformity with the policies and procedures of the Department"; (3) failing to "conduct himself in accordance with high ethical standards, both on and off duty"; (4) failing to "make reports in conformity with procedure and completeness"; (5) failing to "ensure the civil treatment and observance of the rights of all people coming into the scope of his authority"; (6) failing to "use the vehicle assigned to him in the most safe and economical manner, avoiding hazardous or careless operation"; and (7) "violat[ing] the Police Department's Towing and Abandoned Vehicle Policy." *Id.* at 28-29. The Board of Supervisors imposed a three-day suspension. *Id.* at 32. Defendant ultimately did not challenge the suspension due to potentially facing greater disciplinary action. *Id.* at 42.

Plaintiff brought this action against Defendant, alleging "deprivation of rights in violation of federal law" and supplemental claims for "unlawful detention/false imprisonment," intentional infliction of emotion distress, and assault.[6] *See generally* Second Am. Compl. ("SAC") (ECF No. 26). She also seeks punitive damages for each of her claims. *See id.* Defendant raised several affirmative defenses. *See* Answer to SAC at 9-12. Discovery is now closed. Defendant filed a motion for summary judgment on all Plaintiff's claims, as well as Defendant's affirmative defenses of qualified immunity and immunity under the Pennsylvania Political Subdivision Tort Claims Act. 42 Pa. C.S. § 8541 *et seq. See generally* Br. in Supp. of Def.'s Mot. for Summ. J. (ECF No. 46-1).

---

[6] Plaintiff originally sued Defendant, Caernarvon Township, and Caernarvon Township Police Department. *See generally* Compl. (ECF No. 1). In her First Amended Complaint, Plaintiff dropped Caernarvon Township Police Department as a defendant. *See generally* First Am. Compl. (ECF No. 14). Subsequently, the Court granted Caernarvon Township's Motion to Dismiss and dismissed it from this action. *See* Order (ECF No. 38).

### III.    LEGAL STANDARD

Federal Rule of Civil Procedure Rule 56(c) provides that the district court must "grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Essentially, the Court must analyze "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. A genuine issue of fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). At this stage of litigation, all facts presented are viewed in the light most favorable to the nonmoving party. *Daniels v. City of Pittsburgh*, No. 22-1790, 2023 WL 2707178, at *2 (3d Cir. Mar. 30, 2023).

To survive a properly supported motion for summary judgment, the nonmoving party, Plaintiff in this case, must present affirmative evidence of specific facts to demonstrate a genuine issue of material fact. *Anderson*, 477 U.S at 256-57; *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citing *Pa. Prot. & Advoc., Inc. v. Pa. Dep't of Pub. Welfare,* 402 F.3d 374, 379 (3d Cir.2005)) ("Although the non-moving party receives the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact."). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Colkitt*, 455 F.3d at 201; FED. R. CIV. P. 56(c)(1)(A) (requiring any party asserting a fact to "cit[e] to particular parts of materials in the

record"). Statements of Disputed Facts are not evidence, so a "district court may not rely solely on" them to justify a finding that a dispute of material fact exists. *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006), *as amended* (May 5, 2006) (internal citation omitted).

Ordinarily, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Washington v. Ondrejka*, 822 F. App'x 104, 106 (3d Cir. 2020) (per curiam) (quoting *Anderson*, 477 U.S. at 255). But the Court need not accept the nonmovant's version of the facts where a video recording of the incident "blatantly contradicts the non-movant's version so that no reasonable jury could believe it." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (affirming summary judgment where videotape of defendants extracting plaintiff from his cell refuted plaintiff's claim that "defendants' use of force was applied 'maliciously and sadistically to cause harm'"). The Court also should not consider evidence that is inadmissible at trial. *See Bristol v. Settle*, 457 F. App'x 202, 204 (3d Cir. 2012) (citing *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir.1999) (observing it is improper to consider evidence that is inadmissible at trial on summary judgment).

## IV.    ANALYSIS

### a.  Section 1981 Claim for Racial Discrimination

Section 1981 provides that all persons within the United States "have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens," as well as "be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). However, Section 1981 "does not support a cause of action for every instance of racial discrimination or hostility."

*Pinckney v. Pep Boys - Manny Moe & Jack*, No. 19-3775, 2021 WL 3578983, at *2 (3d Cir. Aug. 13, 2021) (citing *Domino's Pizza*, *Inc. v. McDonald*, 546 U.S. 470, 479 (2006); *Hammond v. Kmart Corp.*, 733 F.3d 360, 364 (1st Cir. 2013)). To state a claim under Section 1981, the plaintiff must "prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Af. Am.-Owned Media*, 589 U.S. 327, 341 (2020). That requires showing that: (1) the plaintiff "belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981." *Summers v. Child.'s Hosp. of Phila.*, No. 21-3479, 2021 WL 5789057, at *2 (E.D. Pa. Dec. 7, 2021) (quoting *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 569 (3d Cir. 2002)).

The best the Court can glean from the Complaint and summary judgment record is that Plaintiff brings her Section 1981 racial discrimination action under the "full and equal benefit" clause of 42 U.S.C. § 1981.[7] *See* Pl.'s Br. in Opp'n to Def.'s Mot. For Summ. J., at 12-13 (ECF No. 48). Though most often invoked in contractual matters, Section 1981 protects a limited range of civil rights, which includes guaranteeing the "right to equal benefit of the laws and to like punishment, irrespective of race." *See Travillion v. Harry*, No. 3:22-CV-01196, 2024 WL 1285542, at *7 (M.D. Pa. Mar. 26, 2024), *aff'd sub nom. Travillion v. Wetzel*, No. 24-1763, 2025

---

[7] In her Complaint, Plaintiff brought a count for "deprivation of rights in violation of federal law," and asserted that "[f]ederal law prohibits discrimination on the ground of race in connection with a person's rights under the law. *See* 42 U.S.C.S. § 1981." *See* SAC at ¶ 47. She alleged that Defendant deprived Plaintiff "of her rights under the Constitution and law of the United States, in violation of 42 U.S.C. Section 1983, including violating her 4th amendment rights and violating her Civil Rights under both the US Constitution and the Pa. Constitution." *Id.* at ¶ 50. In Plaintiff's opposition to Defendant's Motion for Summary Judgment, she references the "full and equal benefit" clause, but Plaintiff still does not expressly state this is the right she is asserting was violated under Section 1981. *See* Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss, at 13-19 (ECF No. 48).

WL 971669 (3d Cir. Apr. 1, 2025). "Racially motivated misuse of governmental power falls within the ambit of its 'equal benefit' and 'like punishment' clauses." *Williams v. Pennridge Sch. Dist.*, No. CV 15-4163, 2016 WL 6432906, at *9 (E.D. Pa. Oct. 31, 2016) (quoting *Hall v. Pa. State Police*, 570 F.2d 86, 91 (3d Cir. 1978)).

But Section 1981 does not provide the ***remedy*** for such violations. *McGovern v. City of Phila.*, 554 F.3d 114, 116, 121-21 (3d Cir. 2009). While Section 1981 has been interpreted to permit ***private*** suits for remedies, that is not the case when the defendant is a state actor. *Comcast Corp.*, 589 U.S. at 335 (discussing Supreme Court inferring private cause of action under Section 1981); *McGovern*, 554 F.3d at 116, 121-21. Section 1981 does not itself provide an express or implied cause of action against state actors. *McGovern*, 554 F.3d at 116, 121-21 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731 (1989)). Rather, "the express cause of action for damages created by [42 U.S.C.] § 1983 constitutes the ***exclusive*** federal remedy for violation of the rights guaranteed in § 1981 by state governmental units." *Id.* at 121 (emphasis added) (citing *Jett*, 491 U.S. at 733); *see, e.g.*, *Travillion*, 2024 WL 1285542, at *7 (plaintiff raising Section 1983 claims in violation of Section 1981).

Neither party addressed this issue. Accordingly, the Court ordered supplemental briefing, instructing the parties to address whether the holding in *McGovern* precludes Plaintiff from recovering under Section 1981. *See* Order, Sept. 11, 2025 (ECF No. 54). Defendant argues that Plaintiff is precluded from recovery under Section 1981 because Section 1983 is the exclusive remedy, and Plaintiff never stated a racial discrimination claim under Section 1983. *See* Def.'s Suppl. Br., at 4 (ECF No. 55). Despite Plaintiff arguing in her opposition that the record supports Plaintiff's Section 1981 claim, *see* Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. at 11-19 (ECF No. 48), she reversed course in her supplemental brief. *See* Pl.'s Suppl. Br., at 2 (ECF No. 56). In

her supplemental brief, Plaintiff argues that she **did** assert her Section 1981 claim under Section 1983. *See id.* Plaintiff maintains that Paragraph 50 of her Second Amended Complaint properly asserts her claim under Section 1983. *See id.* at 5.

Plaintiff cannot maintain this action under Section 1981. Defendant is a state actor, and *McGovern* makes clear that Section 1981 does not provide an express or implied cause of action against state actors. *McGovern*, 554 F.3d at 116, 121-21 (citing *Jett*, 491 U.S. at 731); *see also Archie v. City of Phila.*, No. CV 22-2915, 2025 WL 220024, at *4 (E.D. Pa. Jan. 16, 2025) (granting summary judgment for defendant because Section 1981 does not provide a private right of action against state actors); *Odi v. Alexander*, No. CV 15-4903, 2017 WL 914818, at *9 (E.D. Pa. Mar. 7, 2017) ("[T]he exclusive means of enforcing rights under Section 1981 is through Section 1983."). Defendant's motion for summary judgment on Plaintiff's Section 1981 claim, insofar as Plaintiff brought her claim under Section 1981, is **GRANTED**.

However, the Court will consider the merits of Plaintiff's claim under Section 1983. While Plaintiff did not expressly assert her Section 1981 claim under Section 1983 in her Complaint, she did allege that Defendant "deprived Ms. Bolder of her rights under the Constitution and law of the United States, in violation of 42 U.S.C. Section 1983, including . . . violating her Civil Rights under . . . the US Constitution." *See* SAC at ¶ 50 (ECF No. 26).

### b. Section 1983 Claims

"Section 1983 provides a civil remedy for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 290 (3d Cir. 2014) (quoting 42 U.S.C. § 1983). It requires the plaintiff to show that a "person has deprived him of a federal right," and that person "acted under color of state or territorial law." *Id.* Plaintiff alleges that Defendant violated Section 1983 by: (1) racially discriminating against her, and (2) unlawful

seizure. *See* Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. at 11-21 (ECF No. 48). For the reasons that follow, the Court **GRANTS** summary judgment on Plaintiff's racial discrimination claim and **DENIES** summary judgment on Plaintiff's unlawful seizure claim.

### 1. Section 1981 Claim Brought Under Section 1983

As discussed above, Plaintiff must demonstrate that she is a racial minority, Defendant intended to discriminate against her on the basis of race, and the discrimination concerns one or more of the enumerated activities in Section 1981 to prevail on her racial discrimination claim. *See Summers*, 2021 WL 5789057, at *2 (quoting *Pryor*, 288 F.3d at 569). Only intentional discrimination will give rise to a Section 1981 claim. *Pryor*, 288 F.3d at 562; *see also Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391, (1982) (explaining only purposeful discrimination will violate Section 1981). That requires the Plaintiff to "prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp.*, 589 U.S. at 341, (2020); *see, e.g.*, *Gross v. R.T. Reynolds, Inc.*, 487 F. App'x 711, 716-17 (3d Cir. 2012) (explaining plaintiff failed to explain how defendant "treated non-minority contractors any differently than it treated him, or how delays in the construction project were motivated by or related to [plaintiff's] race"); *Travillion*, 2024 WL 1285542, at *8 ("[Plaintiff] has failed to adduce any evidence that similarly situated white inmates have been treated differently, nor has he adduced any other evidence that defendant . . . was motivated by race-based animus.").

A police officer's improper behavior can deprive someone of "equal benefit" of the law, but the motivating factor of the alleged discrimination must be racial animus. *Wright v. Reed*, No. 5:20-CV-02664, 2021 WL 912521, at *2 (E.D. Pa. Mar. 10, 2021) (first citing *Crane v. Cumberland Cnty., Pa.*, No. CIV.A. 1:CV-99-1798, 2000 WL 34567277, at *11 (M.D. Pa. June 16, 2000), *aff'd sub nom. Crane v. Cumberland Cnty., Pa*, 64 F. App'x 838 (3d Cir. 2003); and

14

then citing *Grier by Grier v. Galinac*, 740 F. Supp. 338, 342 (M.D. Pa. 1990)). Race by itself is not enough to create an inference that one acted with discriminatory intent. *Spencer v. Bloomingdale's*, No. CV 17-3775, 2018 WL 5996640, at *5 (E.D. Pa. Nov. 15, 2018) (finding "race alone cannot give rise to an inference that [defendant] acted with discriminatory intent" at the summary judgment stage).

Defendant focuses on the second element. *See* Br. in Supp. of Def.'s Mot. for Summ. J., at 8 (ECF No. 46-1). He argues that Plaintiff has not shown any evidence of purposeful discriminatory intent. *id.* Defendant relies on the fact that he "never used any racial slur or foul language," Defendant believed he had a basis to arrest Plaintiff if she did not pay him back for theft of service, and Defendant acted in a similar manner towards the tow driver, a white man. *Id.*

In response, Plaintiff argues that Defendant made demeaning comments that were stereotypically based on her race. Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. at 15 (ECF No. 48). In support of that argument, she notes that Defendant returned to Walmart at a high rate of speed, slid to a stop behind Plaintiff's car, demanded that Plaintiff pay the tow driver, "aggressively" questioned her financial situation and employment status, "demanded an explanation" of how she supported herself, asked if there was anyone she could borrow $100 from, cursed at Plaintiff and "continued to put her down for about 5 minutes," and pointed at Plaintiff while yelling. *Id.* at 14. She also states that Defendant instructed that she could not leave. *Id.*

Plaintiff also points to Defendant's conduct with others. She states that Defendant "tore off at high speed in his police car with his motor screaming and floored it through multiple parking lot intersections to the Bank," pulled into the ATM line from the wrong direction, pinned people in line who were waiting to use the ATM, and used his emergency lights to drive through

intersections. *See id.* at 15. Plaintiff argues that this conduct violated his department's procedures, and he received a three-day suspension without pay. *Id.* She portrays these violations as:

1. **Conduct Unbecoming an Officer** - harassing Ms. Bolder, unlawfully directing her not to leave the Walmart lot, and threatening to locate and arrest her for theft.

2. **Neglect of Duty** - failing to fulfill his responsibilities as a police officer by refusing to assist a citizen in distress.

3. **Failure to Adhere to High Ethical Standards** - engaging in racially discriminatory conduct toward Ms. Bolder because she is Black.

4. **Failure to Ensure Civil Treatment and Protect Rights** - violating the rights of a person under his authority through harassment and racial intimidation.

5. **Failure to File Truthful and Complete Reports** - omitting material facts and failing to produce a truthful and complete incident report.

6. **Improper and Unsafe Use of a Patrol Vehicle** - operating his police vehicle at a hazardous speed, running intersections, unlawfully passing vehicles with emergency lights activated, and using his vehicle to pin Ms. Bolder and ATM users in place.

7. **Careless Operation of a Patrol Vehicle** - creating unnecessary danger to pedestrians and motorists.

*Id.* at 7 (citing App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 28-29 (ECF No. 48-2)).

After weeding out Plaintiff's evidence that is unsupported by the record[8] or that the Court

---

[8] Some of Plaintiff's "facts" are not born out by the record, and in several instances, Plaintiff's counsel exceeds the boundaries of inferential license common in the name of advocacy. For instance, on the critical issue of whether there was a discriminatory motive behind Defendant's rude behavior, Plaintiff claims the police chief disciplined Defendant for "racial discrimination" and "racial intimidation." Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. at 7 (ECF No. 48). Plaintiff's own citation to the record belies this critical contention. *See* App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 28-29 (ECF No. 48-2). Further, the videos from Defendant's body-worn camera contradict the repeated claim that Defendant's patrol car "pinned" Plaintiff into her parking spot. *See* App'x to Def.'s Mot. for Summ. J., Ex. B, at 0:01-12 (ECF No. 47-1); *id.*, Ex. C, at 0:45. Similarly, the second encounter between Plaintiff and Defendant did not exceed three minutes, let alone the five minutes claimed. *See id.*, Ex. B, at 0:15-2:56 (ECF No. 47-1). And during the one-to-two-minute period of time when Defendant was yelling at Plaintiff—depending on what the factfinder would consider to be "yelling"—he never "cussed" at her. *See id.*, Ex. B, at

previously ruled is inadmissible at trial,[9] Plaintiff does not put forth enough evidence to survive summary judgment. Plaintiff had to prove discriminatory intent. Not only did Plaintiff fail to demonstrate that Defendant treated her differently on the basis of race, her own evidence points to the opposite conclusion. Plaintiff was not the only person on the receiving end of Defendant's irrational behavior. Seconds after Defendant yelled at Plaintiff, he similarly yelled at the tow truck driver, Gullo, and ignored Gullo's attempts to speak with him about Plaintiff not needing to pay immediately. App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 21 (ECF No. 48-2). Defendant then directed this anger towards bank patrons by pulling into the ATM line from the wrong direction—"pinning" three vehicles in line. *Id.* After leaving the bank, Defendant sped down Route 23 through traffic lights and with his emergency lights on, all to withdraw $100 from the ATM and pay a tow truck driver. *Id.*

Moreover, given the absence of any overt evidence of racial animus, Plaintiff relies most heavily on Defendant's allegedly stereotypical language in inquiring whether Plaintiff could secure $100. However, this line of questioning must be considered in the context in which it was asked. Defendant asked Plaintiff if she had a job or knew anyone who could give her $100 to pay Gullo or, failing that, to pay back Defendant for fronting the money on Plaintiff's behalf. *See* App'x to Def.'s Mot. for Summ. J., Ex. B, at 0:52-2:18 (ECF No. 47-1). Indeed, these inquiries were nearly identical to those asked by Gullo when Plaintiff first told him she could not immediately pay the

---

1:00-3:00. Some of these discrepancies are more material than others, but they are hardly indicative of a confident argument.

[9] Plaintiff relies on two of her experts to establish racial discrimination, Darrin Porcher, Ph.D. and Pastor John Peyton, Ph.D. However, the Court has already ruled that their testimony is inadmissible and explained its reasoning for those rulings at length. *See* Mem. Op., at 7-11, 18-22, Oct. 31, 2025 (ECF No. 77). Because the Court cannot consider inadmissible evidence on summary judgment, the Court does not address these experts' opinions. *See Bristol*, 457 F. App'x at 204 (citing *Pamintuan*, 192 F.3d at 387 n.13).

$100 service fee. *See* App'x to Pl.'s Opp'n to Def.'s Mot. for Summ. J., at 21 (ECF No. 48-2). As with Gullo's inquiries, the record supports no more of Defendant's motivation than to arrange payment for the unlocking of Plaintiff's vehicle, particularly when considering his unprofessional behavior was directed towards all he encountered during this incident.

Plaintiff's Section 1981 claim, brought under Section 1983, is based on the formula that a rude officer plus a Black civilian equals racial discrimination. More is needed to prove a racially discriminatory intent underlying the officer's boorish behavior. The Plaintiff has not provided it. Defendant's motion for summary judgment as to the Section 1981 claim brought under Section 1983 is **GRANTED**.

### 2. Unlawful Seizure Claim

Plaintiff asserts that Defendant's conduct on January 20, 2022, constitutes an unlawful seizure. *See* Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., at 20 (ECF No. 48). The Fourth Amendment of the United States Constitution guards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. A seizure occurs "when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *United States v. Silveus*, 542 F.3d 993, 999 (3d Cir. 2008) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)) (alteration in original).

A person has been "seized" when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). This analysis involves considering "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Covington v. Plymouth Twp. Police Dep't*, 779 F. Supp. 3d

509, 524 (E.D. Pa. 2025) (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012)). "Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Chesternut*, 486 U.S. at 573.

When the officer did not use force, like Defendant here, then "***submission*** to the assertion of authority" is necessary. *United States v. Richardson*, 504 F. App'x 176, 181 (3d Cir. 2012) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)) (emphasis in original). There cannot be a seizure without "actual submission." *Id.* (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)). "Submission requires 'something more than a momentary pause or mere inaction.'" *United States v. Richardson*, 504 F. App'x 176, 181 (3d Cir. 2012) (quoting *United States v. Waterman*, 569 F.3d 144, 146 (3d Cir. 2009)).

Defendant argues there was no seizure at all because he was the only officer present for this incident, he never drew his firearm, no one alleged that Defendant put his hand on his firearm, he never touched Plaintiff, he never took Plaintiff's keys or driver's license, and he never handcuffed Plaintiff. *See* Br. in Supp. of Def.'s Mot. for Summ. J., at 9 (ECF No. 46-1). However, the video from Defendant's body-worn camera clearly shows Defendant raising his voice at Plaintiff, shaking his finger at her, and threatening her with arrest if she does not pay him back. There is also a genuine dispute as to whether Defendant told her not to leave. And while Plaintiff did leave her car to use the ATM machine in Walmart, that does not necessarily negate "actual submission." Plaintiff did not travel far or leave Walmart, and withdrawing $100 from the ATM machine fell within Defendant's directive to pay him back or get arrested.

While perhaps a close call, Plaintiff overcomes the hurdle of summary judgment. Viewing these facts in the light most favorable to Plaintiff, it is possible that the jury could find that

Defendant's conduct constitutes an unlawful seizure. Accordingly, Defendant's motion for summary judgment as to unlawful seizure is **DENIED**.

### c.  Supplemental Claim for Unlawful Detention/False Imprisonment

In addition to Plaintiff's Section 1983 unlawful seizure claim, Plaintiff brings a similar state law claim for false imprisonment. To prevail on her false imprisonment claim, Plaintiff must establish that: (1) she was detained; and (2) the detention was unlawful. *Gwynn v. City of Phila.*, 719 F.3d 295, 304 (3d Cir. 2013) (citing *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994)). That requires showing Plaintiff's unlawful detention was "brought about by '(1) acts intending to confine [Plaintiff] within boundaries fixed by another (2) which directly or indirectly result in such confinement (3) of which the plaintiff is conscious or by which the plaintiff is harmed.'" *Torres Crespo v. Mars Wrigley Confectionery US, LLC*, No. 5:23-CV-00744-JMG, 2023 WL 3513309, at *3 (E.D. Pa. May 17, 2023) (quoting *Regan v. Upper Darby Twp.*, 363 F. App'x 917, 922 (3d Cir. 2010)).

Defendant argues that Plaintiff's false imprisonment claim fails because he never told Plaintiff that she could not leave, he never placed her in his vehicle, and he left Plaintiff with her car keys when he went to the bank. *See* Br. in Supp. of Def.'s Mot. for Summ. J., at 13 (ECF No. 46-1). Defendant also argues that Plaintiff did not believe she was falsely imprisoned because she left her car to withdraw money from the ATM. *Id.* However, Plaintiff asserts that Defendant ***did*** order her not to leave the parking lot and threatened her with arrest if she did leave. *See* Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., at 24 (ECF No. 48). Plaintiff also maintains that she acted in accordance with those instructions because she withdrew money from Walmart's ATM machine and did not leave Walmart. *Id.*

Again, there is a genuine dispute as to whether Defendant ordered Plaintiff not to leave the parking lot, and the video is not dispositive. Viewing the facts in the light most favorable to Plaintiff, Defendant ordered her not to leave, and she complied with those directions. While she did go back into the store to withdraw money, she traveled a very short distance and immediately returned to her car. Plaintiff's false imprisonment claim survives summary judgment. Defendant's motion is **DENIED**.

### d.  Supplemental Claim for Intentional Infliction of Emotional Distress

Plaintiff raises a supplemental claim against Defendants for intentional infliction of emotional distress ("IIED"). Establishing a claim of IIED under Pennsylvania law is a high bar. For Plaintiff to succeed, she must prove that: (1) Defendant's conduct was "extreme and outrageous"; (2) Defendant's conduct was "intentional or reckless"; (3) Defendant's conduct "cause[d] emotional distress"; and (4) Plaintiff's distress was severe. *Smith v. RB Distrib., Inc.*, 515 F. Supp. 3d 311, 315 (E.D. Pa. 2021) (quoting *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. Super. Ct. 1997), *aff'd* 720 A.2d 745 (Pa. 1998)). Plaintiff must also "suffer some type of resulting physical harm due to the defendant's outrageous conduct." *Reedy v. Evanson*, 615 F.3d 197, 231 (3d Cir. 2010) (quoting *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005)); *Greiser v. Drinkard*, 516 F. Supp. 3d 430, 439 (E.D. Pa. 2021). That includes "physical manifestations of emotional suffering, *i.e.* depression, nightmares, stress, and anxiety" that are ongoing and require treatment. *Love v. Cramer*, 606 A.2d 1175, 1179 (Pa. Super. Ct. 1992); *Brown v. Am. Airlines, Inc.*, 723 F. Supp. 3d 411, 423 (E.D. Pa. 2024).

At the outset, the Court must determine as a matter of law whether a reasonable jury could find Defendant's conduct "extreme and outrageous." *See LiCausi v. Allentown Sch. Dist.*, No. 5:21-CV-00957-JDW, 2023 WL 4471686, at *6 (E.D. Pa. July 11, 2023) (quoting *Swisher*, 868

A.2d at 1231) (explaining courts must "determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery"); *Zucal v. Cnty. of Lehigh*, 760 F. Supp. 3d 290, 305 (E.D. Pa. 2024) ("Conclusory allegations of harassment and discrimination in the workplace that are not continuing and malicious are insufficient."); *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1274 (holding physician informing press that a person was suffering from a potentially fatal disease despite knowing he was not could be "extreme and outrageous"). The defendant's "conduct must be 'so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society.'" *LiCausi*, 2023 WL 4471686, at *6 (quoting *Swisher*, 868 A.2d at 1230). "If the plaintiff has satisfied this threshold evidentiary requirement, the jury must find the facts and make its own characterization." *Chuy*, 595 F.2d at 1274.

"Courts are cautious to declare conduct outrageous so as to permit recovery." *Stoltz v. Cnty. of Lancaster*, No. 08-CV-5622, 2011 WL 815709, at *17 (E.D. Pa. Mar. 7, 2011) (quoting *Project Mgmt. Inst., Inc. v. Ireland*, 2000 WL 375266, at *6 (E.D. Pa. Apr.11, 2000)) (citation modified). It is reserved for "only the most egregious conduct," such as killing someone in a car accident and burying the body, "intentionally fabricat[ing] records to suggest that plaintiff had killed a third party which led to plaintiff being indicted for homicide," and informing the press that the plaintiff had a fatal disease while knowing that was false. *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (collecting cases). It is not enough for the defendant to have "acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." *Id.* (first quoting RESTATEMENT (2D) OF TORTS § 46, comment d; and then citing *Daughen v. Fox*, 539 A.2d 858, 861 (Pa. Super. Ct. 1988). Nor are "mere insults,

indignities, threats, annoyances, petty oppressions, or other trivialities" sufficient. *Mehdizadeh v. Starbucks Corp.*, No. CV 24-3339, 2024 WL 4803735, at *3 (E.D. Pa. Nov. 15, 2024) (quoting *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 991 (Pa. 1987)).

Defendant argues that him being "rude" to Plaintiff while asking about her employment status and ability to pay the towing company fell below the "extreme and outrageous" requirement. *See* Br. in Supp. of Def.'s Mot. for Summ. J., at 14 (ECF No. 46-1). Defendant also argues there is no evidence that his conduct was intentional or reckless, and there is no evidence that he caused Plaintiff "severe" emotional distress. *See id.* In response, Plaintiff argues that Defendant's conduct was "outrageous" because he threatened to arrest her, yelled at her, "demeaned" her by questioning her financial and employment status, and continued to intimidate her despite Plaintiff's pleas to stop. *See* Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., at 25-26 (ECF No. 48). She further argues that Defendant's conduct had an "added element of racial intimidation." *See id.* at 26 (ECF No. 48). Plaintiff also notes that the evidence shows suffered severe emotional distress: she is triggered by people in uniform, she suffers from repeated nightmares, and she struggled with substance abuse. *See id.*

Defendant's behavior was unacceptable, but it does not rise to the level of "outrageous" necessary for an IIED claim. Even assuming that Defendant acted in a racially discriminatory manner, racial discrimination by itself does not satisfy the "extreme and outrageous" standard. *Brown*, 723 F. Supp. 3d at 423-24 (dismissing IIED claim where defendant removed plaintiffs from their flight and rebooked their flights for the next day without offering overnight accommodations due to defendant's alleged discriminatory motive); *Coney v. Pepsi Cola Bottling Co.*, No. CIV. A. 97-2419, 1997 WL 299434, at *1 (E.D. Pa. May 29, 1997) ("[T]he cases in our district have consistently held that highly provocative racial slurs and other discriminatory

incidents do not amount to actionable outrageous conduct." (collecting cases)). And while Courts have allowed IIED cases to proceed where the officers physically injured the plaintiff or "officer's conduct was otherwise exceptionally reprehensible," *see Gahagan v. City of Phila.*, No. CV 21-2523, 2022 WL 16745098, at \*9 (E.D. Pa. Nov. 7, 2022), the officer's behavior must still "sink to the level that can properly be termed 'atrocious and utterly intolerable in a civilized society.'" *Mastromatteo v. Simock*, 866 F. Supp. 853, 859 (E.D. Pa. 1994) (quoting *Salerno v. Phila. Newspapers, Inc.*, 546 A.2d 1168, 1172 (Pa. Super. Ct. 1988).

Courts have found police officer conduct did not rise to "outrageous" in far more egregious police encounters. "[A]n officer manufactur[ing] facts to support his affidavit of probable cause" was not sufficiently outrageous. *See Thompson v. City of Williamsport*, No. 4:22-CV-01159, 2024 WL 1747645, at \*17 (M.D. Pa. Apr. 23, 2024) (citing *Mastromatteo*, 866 F. Supp. at 859). Nor was being held on an invalid warrant and without food for nearly 24 hours. *Williams v. N. Coventry Twp.*, No. 2:24-CV-06767-JDW, 2025 WL 1361286, at \*4 (E.D. Pa. May 9, 2025). An officer even evaded the label of "outrageous" when he burst through a door with other task force officers—all of whom were wearing black clothing and did not identify themselves as police officers—ordered the plaintiff to "freeze and get your hands up," grabbed the "frozen" plaintiff, dragged her off the staircase, flung her face-first into the couch, pressed the back of her neck, continued to hold her down despite the plaintiff struggling to breathe, and manhandled the plaintiff into handcuffs, all the while the plaintiff was exposed from her dress being lifted up, *Kreider v. Breault*, No. CIV.A. 10-3205, 2012 WL 118326, at \*2, \*8 (E.D. Pa. Jan. 13, 2012).

Because Defendant's conduct falls short of "outrageous," Defendant's motion for summary judgment on Plaintiff's IIED claim is **GRANTED**.

###### e.   Supplemental Assault Claim

Under Pennsylvania law, an assault is "an act intended to put another in reasonable apprehension of an immediate battery" (*i.e.*, "offensive contact with the person of another" and the intent to cause said contact), causes an apprehension of said battery. *Kevin C. v. Founds. Behav. Health*, 705 F. Supp. 3d 368, 393 (E.D. Pa. 2023) (first quoting *D'Errico v. DeFazio*, 763 A.2d 424, 431 n.2 (Pa. Super. Ct. 2000); and then quoting *Montgomery v. Bazaz-Sehgal*, 742 A.2d 1125, 1130 (Pa. Super. Ct. 1999)). Defendant argues that stating, "If you do not pay me, I will arrest you for theft" is not an assault because "it was nothing more than words," and there is no affirmative action on Defendant's part. *See* Br. in Supp. of Def.'s Mot. for Summ. J., at 15 (ECF No. 46-1). Without directing the Court to any cases to support her proposition, Plaintiff argues that Defendant "expressly threaten[ing] to locate and arrest" her if she did not pay him back, and doing so in an "angry, aggressive manner" constitutes an assault. *See* Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., at 28 (ECF No. 48).

Threatening to arrest someone in the future is not enough to put someone in "reasonable apprehension of an ***immediate*** battery." *See Kevin C.*, 705 F. Supp. 3d at 393; *cf. Napier v. City of New Castle*, No. CIV A 06-1368, 2007 WL 1965296, at *8 (W.D. Pa. July 3, 2007), *aff'd*, 407 F. App'x 578 (3d Cir. 2010) (observing the "mere threat of incarceration is not sufficient to put a person in imminent apprehension of physical injury and does not constitute an assault"). Defendant's motion for summary judgment on Plaintiff's assault claim is **GRANTED**.

###### f.   Qualified Immunity

Defendant seeks summary judgment on the affirmative defense of qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged

25

conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). As an affirmative defense, the burden of establishing immunity falls on the official claiming it. *See Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011).

In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry: (1) whether the facts, taken in the light most favorable to the nonmoving party show the officer's conduct violated a federal right, and (2) whether the right in question was clearly established at the time of the violation. *See Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014). Courts are free to address the two elements in whichever order they deem appropriate. *Halsey*, 750 F.3d at 287.

A right is clearly established if the state of the law at the time of the violation gives state actors "fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Courts should not "define clearly established law at a high level of generality." *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 716 (3d Cir. 2018) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)) (explaining officer's "request for qualified immunity must be assessed within the context of the case law that has developed from accidents caused by high-speed police pursuits that injure third parties"). A case need not be "directly on point for a right to be clearly established," but there must be "existing precedent" that "placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (citation modified).

Defendant does not contest that Plaintiff has a Fourth Amendment right to be free from unreasonable searches and seizures. Nor does Defendant assert it is not clearly established that an officer must have a minimum of reasonable suspicion before conducting a seizure. *See United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015) ("Though law enforcement officers ordinarily

must obtain a warrant based on probable cause before conducting a seizure, in *Terry v. Ohio* the Supreme Court articulated an exception that . . . . 'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" (citations omitted)). Rather, Defendant maintains that he is entitled to qualified immunity as to Plaintiff's unlawful seizure claim for his "reasonable but mistaken belief that he had a basis to arrest Plaintiff for theft of services."[10]

If there are disputed material facts as to the qualified immunity determination at the summary judgment stage, then the police officer is not entitled to qualified immunity. *Covington*, 779 F. Supp. 3d at 522 (citing *Ciardiello v. Sexton*, 390 F. App'x 193, 201 (3d Cir. 2010)). The existence of disputed, historical facts that are material to Defendant's objective reasonableness is a jury issue. *See Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) ("a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis.").

Here, there are at least two factual disputes relevant to the qualified immunity defense: whether Defendant told Plaintiff that she could not leave Walmart, and whether Defendant's threat of arrest was a mistake. If Defendant did tell Plaintiff that she could not leave, that can be enough for the jury to find Defendant "seized" Plaintiff. Moreover, the jury could find that Defendant made his threat of arrest out of anger and frustration—not a mistake as to his authority. Because inferences are to be drawn in Plaintiff's favor at this stage, the Court **DENIES** Defendant's motion for summary judgment on qualified immunity.

---

[10] Defendant also argues that no reasonable officer would think that parking on the opposite side of the parking lot would constitute a "seizure." *See* Br. in Supp. of Def.'s Mot. for Summ. J., at 12 (ECF No. 46-1). The Court agrees with Defendant on this point, but that does not end the Court's qualified immunity inquiry.

### g. Official Immunity

Defendant also raises the affirmative defense of official immunity as to Plaintiff's state law claims. State officials are granted official immunity under the Pennsylvania Political Subdivision Tort Claims Act ("Tort Claims Act"), 42 Pa. C.S. §§ 8501-8564. Defendant receives substantially the same protection, if not more protection, under Pennsylvania law as he does federal law. *See DeVatt v. Lohenitz*, 338 F. Supp. 2d 588, 598 (E.D. Pa. 2004). To be protected by official immunity, Defendant must establish: (1) the claim asserted must arise from or be reasonably related to the employee's duties; (2) the employee's actions must not constitute a "crime, actual fraud, actual malice or willful misconduct"; and (3) "the conduct of the employee which gave rise to the claim was authorized or required by law," or the employee "in good faith reasonably believed the conduct was authorized or required by law." *See* 42 Pa. C.S. §§ 8545-46, 8550; *see also DeVatt*, 338 F. Supp. 2d at 599-600.

Defendant is not entitled to immunity under the Tort Claims Act for the same reasons he is not entitled to qualified immunity. Defendant had no reasonable suspicion, let alone probable cause, to order Plaintiff not to leave. And though Defendant maintains he "believed in good faith at the time that he was authorized under the law and would have been within his duties to arrest Plaintiff for theft of service," Br. in Supp. of Def.'s Mot. for Summ. J., at 16 (ECF No. 46-1), that requires the Court to accept that Defendant acted out of a mistaken belief. At this juncture, the Court must draw inferences in Plaintiff's favor, and it is plausible that Defendant acted out of anger or frustration.

### h. Punitive Damages

Defendant asserts that Plaintiff is not entitled to punitive damages because the record does not show he acted in a reckless or callous manner. *See id.* However, "an inquiry into the availability

of punitive damages and the intent behind a defendant's conduct is inherently fact-specific." *Judge v. Shikellamy Sch. Dist.*, 135 F. Supp. 3d 284, 300 (M.D. Pa. 2015), *aff'd*, 905 F.3d 122 (3d Cir. 2018); *see also Ponzini v. Monroe Cnty.*, 789 F. App'x 313, 314 (3d Cir. 2019) (citing *SHV Coal, Inc. v. Cont'l Grain Co.*, 587 A.2d 702, 705 (Pa. 1991)) (observing a determination of recklessness "lies within the sound discretion of the fact finder" under Pennsylvania law).

The Court declines to enter summary judgment on punitive damages. Courts permit punitive damages for both of Plaintiff's surviving claims. *See Ciaccio v. Upper Saucon Twp.*, No. 5:23-CV-02863-JDW, 2025 WL 1268689, at *11 (E.D. Pa. May 1, 2025) (recognizing punitive damages in Section 1983 suit "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others" (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983))); *Chuy*, 595 F.2d at 1277 ("Punitive damages are commonly awarded in cases of intentional torts."); *LeBeau v. Raith*, No. CV 17-38, 2017 WL 2264639, at *8 (E.D. Pa. May 24, 2017) (recognizing false imprisonment is an intentional tort).

Whether under federal law or Pennsylvania law, Plaintiff must show a minimum of "reckless" conduct on Defendant's part. *See Covington*, 779 F. Supp. 3d at 538-39 ("It is sufficient for the plaintiff to show either that the defendant acted with actual knowledge that he was violating a right secured by the Constitution and laws, or that the defendant acted with reckless disregard of whether he was thus violating such a right." (quoting *Cochetti v. Desmond*, 572 F.2d 102, 106 (3d Cir. 1978)) (citation modified)); *Ponzini*, 789 F. App'x at 314 ("Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." (quoting *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766 (Pa. 2005)) (citation modified)). Viewing the facts in the light most favorable to Plaintiff, is possible the jury

could find that Defendant's conduct was sufficiently "reckless" or "outrageous" to give rise to punitive damages.[11] Defendant's motion for summary judgment as to punitive damages is therefore **DENIED**.

## V.    CONCLUSION

The Court finds that no reasonable fact finder could reach a judgment for the Plaintiff on her claims for racial discrimination, intentional infliction of emotional distress, or assault, even drawing all inferences in her favor. As the non-moving party, Plaintiff was required to put forth evidence to generate a genuine dispute of material fact, and she has not done so for these claims. However, Plaintiff has raised a genuine dispute of material fact for her Section 1983 unlawful seizure claim and state law false imprisonment claim, as well as her ability to recover punitive damages for her surviving claims. Defendant is also not entitled to immunity on these claims.

Accordingly, the Court **GRANTS** summary judgment for Defendant on Plaintiff's claims for Section 1981 claim brought under Section 1981, Section 1981 brought under Section 1983, intentional infliction of emotional distress claim, and assault. The Court **DENIES** summary judgment on Plaintiff's Section 1983 claim for unlawful seizure, Plaintiff's false imprisonment claim, punitive damages, and Defendant's immunity defenses.

BY THE COURT:

_____
JOHN M. GALLAGHER
United States District Court Judge

---

[11] Allowing punitive damages to proceed but not IIED is not inconsistent. "Under Pennsylvania law, the outrageousness standard for IIED is higher than that required for punitive damages." *Brown*, 723 F. Supp. 3d at 426 (citing *Hoy*, 720 A.2d at 754). Thus, Plaintiff's claims can be "outrageous" enough to warrant punitive damages while also not meeting the high bar of "extreme and outrageous" for an IIED claim.